IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-02413-CNS-MEH

ANGELO BROCK, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

FLOWERS FOOD, INC., a Georgia corporation,
FLOWERS BAKERIES, LLC, a Georgia limited liability company, and
FLOWERS BAKING CO. OF DENVER, LLC, a Colorado limited liability company,

      Defendants.

---

## ORDER

---

Before the Court is Defendants Flowers Food, Inc., Flowers Bakeries, LLC, and Flowers Baking Co. of Denver, LLC's Motion to Dismiss or Stay Proceedings and Compel Individual Arbitration (ECF No. 28). For the reasons set forth below, the Court DENIES the motion.

### I. BACKGROUND[1]

Flowers Foods, Inc. is a baking company that operates several subsidiaries (*see, e.g.,* ECF No. 28-1 at 1 ¶ 3). Flowers Foods, Inc. is the ultimate parent company of Flowers Bakeries, LLC, and Flowers Baking Company of Denver, LLC, which is a wholly owned subsidiary of Flowers Bakeries, LLC (*id.* at ¶ 2). Flowers Foods, Inc., and its subsidiaries (collectively "Flowers")

---

[1] The background facts are taken from materials submitted in connection with the parties' briefing. *See Bigben 1613, LLC v. Belcaro Grp., Inc.,* No. 17-CV-00272-PAB-STV, 2017 WL 9938347, at *1 (D. Colo. Apr. 25, 2017).

produce "fresh breads, buns, rolls, and snack cakes" (*id.* at ¶ 3). These products are sold in supermarkets, drug stores, and convenient stores throughout the United States (ECF No. 29-3 at 8). Flowers' sale of these products generates billions of dollars in revenue each year (ECF No. 29-1 at 2 ¶ 2).

Flowers uses "Direct-Store-Delivery" to sell its products (ECF No. 29-2 at 2). Under this sales model, Flowers produces and markets its baked goods, and "sells its products through a network of independent distributors to retail and foodservice customers" (*id.*). Independent distributors are responsible for ordering products, which are then delivered to them from bakeries for sale and "direct delivery to customer stores" (ECF No. 29-3 at 9). Bakeries are located throughout the United States (*see, e.g.,* ECF No. 29-2 at 3; ECF No. 29-8 at 7–8). Flowers Baking Company of Denver, LLC contracts with independent distributor franchisees, including Brock, Inc., the company owned and operated by Plaintiff Angelo Brock, to bring Flowers bakery products to market (ECF No. 28-1 at 1 ¶ 4).

Most products that Brock Inc. orders for Mr. Brock's customers "are produced by out-of-state bakeries in response to his specific orders" (ECF No. 28-1 at 3 ¶ 11). These products are then shipped to Mr. Brock's warehouse in Colorado, where Mr. Brock and Brock Inc.'s "ultimate sale and delivery of the products to end customers for whom he ordered them pursuant to the Direct Store Delivery system" occurs (*id.*; *see also* ECF No. 28-1 at 36). When delivery trucks containing the Flowers products that he has ordered arrive at Mr. Brock's warehouse, he accepts the products, "sign[s] off" on them, loads them onto trucks, and "gets to work in [his] territories" (ECF No. 29-6 at 2 ¶¶ 3–4). Then, Mr. Brock "begin[s] to service the customers on [his] stops immediately after" (*id.* at ¶ 4).

To become an independent distributor for Flowers, Mr. Brock signed a Distributor Agreement (*see* ECF No. 28-1 at 6). The Distributor Agreement contained an "Arbitration Agreement" (*id.* at 38–40). The Arbitration Agreement provides:

> The parties agree that any claim, dispute, and/or controversy except as specifically excluded herein, that either DISTRIBUTOR may have against COMPANY (and/or its affiliated companies . . . ) . . . arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between DISTRIBUTOR and COMPANY, including . . . any other association that DISTRIBUTOR may have with COMPANY ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.) ("FAA") . . . .
>
> Covered Claims covered under this Arbitration Agreement include, but are not limited to: breach of contract, any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor, … claims for alleged unpaid compensation, … or statutory penalties under either federal or state law

(ECF No. 28-1 at 38–39). The Arbitration Agreement also states that it "shall be governed by the [Federal Arbitration Act] and <u>Colorado</u> law to the extent <u>Colorado</u> law is not inconsistent" with the Federal Arbitration Act (*id.* at 38, 40 (original emphasis)).

Mr. Brock filed his Class and Collective Action Complaint in September 2022, alleging that Flowers violated the Fair Labor Standards Act and Colorado law principally by misclassifying its employees as independent contractors and failing to pay overtime and other wages (*see generally* ECF No. 1). Flowers filed the instant motion to compel in February 2023, seeking to compel Mr. Brock to individual arbitration (*see, e.g.,* ECF No. 28 at 20). The motion to compel is fully briefed (*see* ECF Nos. 29 and 33).

## II. LEGAL STANDARD

A strong federal policy favoring arbitration "is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (citation omitted). The Federal Arbitration Act requires courts to enforce arbitration agreements in contracts "evidencing a transaction involving commerce . . . save upon such grounds as exist at law or in equity" for contracts' revocation. 9 U.S.C. § 2. Under the Federal Arbitration Act, a party may bring a motion to compel arbitration. *See, e.g.,* 9 U.S.C. § 4; *Fundamental Admin. Servs., LLC v. Patton*, 504 F. App'x 694, 698 (10th Cir. 2012). The party attempting to compel arbitration bears the burden of "demonstrating a valid arbitration agreement" exists. *Fundamental Administrative Services*, 504 F. App'x at 698 (quotations omitted); *see also Burgess v. Johnson*, 835 F. App'x 330, 332 (10th Cir. 2020). The party opposing arbitration based on an arbitration exemption bears the burden of demonstrating that they fall within an exemption under the Federal Arbitration Act. *See, e.g., Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987) ("The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." (citation omitted)); 9 U.S.C. § 1.

"When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citation omitted). The Federal Arbitration Act contains several "enforcement mechanisms" for parties to compel arbitration pursuant to a valid agreement to arbitrate. *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 909 (9th Cir. 2020). However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)

(quotations omitted). Moreover, § 1 of the Federal Arbitration Act provides that "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" are exempt from the Act's coverage. "[A] court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019).

### III. ANALYSIS

Having considered Flowers' motion, related briefing, and relevant legal authority, the Court denies Flowers' motion. In explaining this denial, the Court first details recent legal developments regarding the Federal Arbitration Act, and then applies those developments in its analysis of Flowers' motion.

### A. *Southwest Airlines Company v. Saxon* and Section 1

Central to the parties' dispute is the Supreme Court's recent decision in *Southwest Airlines Company v. Saxon*, 142 S. Ct. 1783 (2022). Flowers urges an interpretation of § 1 and *Saxon* under which the Court, in determining whether § 1's "transportation workers" exemption applies, should look to the nature of Flowers' business and whether Mr. Brock is "involved in interstate commerce" (ECF No. 28 at 9). Mr. Brock reads § 1 and *Saxon* differently, arguing that the Court's inquiry should focus on the relevant class of workers to which he belongs, and if that class of workers is engaged in interstate commerce (*see, e.g.,* ECF No. 29 at 19). The Court agrees with Mr. Brock.

*Saxon*'s import is widely acknowledged. *See, e.g., Bissonnette v. LePage Bakeries Park St., LLC*, 59 F.4th 594 (2d Cir. 2023) ("The Supreme Court's decision in *Saxon* . . . is [an] intervening decision . . . [warranting] rehearing *en banc*.") (Nathan, J., dissenting from denial of

rehearing *en banc*). *Saxon* clearly established the legal framework for applying § 1's "transportation workers" exemption: in assessing § 1's applicability, courts first "define the relevant 'class of workers' to which [the plaintiff] belongs [and then] determine whether that class of workers is 'engaged in foreign or interstate commerce.'" *Saxon*, 142 S. Ct. at 1788; *see also id.* at 1793. Although divided on the factual circumstances that warrant § 1's application in *Saxon*'s wake, appellate courts are largely in accord on the § 1 framework that *Saxon* established. *Compare Fraga v. Premium Retail Servs., Inc.*, 61 F.4th 228, 234 (1st Cir. 2023), *with Lopez v. Cintas Corp.*, 47 F.4th 428, 431 (5th Cir. 2022).[2]

Flowers interprets *Saxon* and § 1 differently. According to Flowers, in determining whether § 1 applies the Court should look to the nature of its own business—and that, dispositively in this case, Flowers is not a transportation company (ECF No. 28 at 9). But *Saxon* forecloses this interpretation of § 1. Assessing § 1's applicability, the nature of an employer's business is not dispositive, given courts' focus on the work a plaintiff performs. *See, e.g., Canales v. CK Sales Co., LLC*, --- F.4th ----, No. 22-1268, 2023 WL 3269173, at *5 (1st Cir. May 5, 2023) ("[T]he inquiry trains on what the worker does at the company, not what the company does generally . . . . [therefore] [w]e look to what work plaintiffs do, not what defendants do generally." (first alteration added) (quotations removed)); *Saxon*, 142 S. Ct. at 1788 ("Saxon is therefore a member of a 'class of workers' based on what she does at Southwest, *not what Southwest does generally*." (emphasis added)).

In its invitation to misinterpret *Saxon* and § 1, Flowers relies chiefly on two appellate cases, *Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655 (2d Cir. 2022), and *Hill v. Rent-A-*

---

[2] As Mr. Brock notes, the Tenth Circuit has not yet had occasion to interpret or apply *Saxon* (ECF No. 29 at 25).

*Ctr., Inc.*, 398 F.3d 1286 (11th Cir. 2005). The Court declines Flowers' invitation and rejects the reasoning of *Hill* and *Bissonnette*. First, *Hill* was decided without *Saxon*'s controlling guidance on § 1's interpretation. *See generally Hill*, 398 F.3d 1286. Second, *Bissonnette* discussed *Saxon* in concluding that "an individual works in a transportation industry if the industry in which the individual works pegs its charges chiefly to the movement of goods or passengers, and the industry's predominant source of commercial revenue is generated by that movement." *Bissonnette*, 49 F.4th at 661. But in the Second Circuit's view, *Saxon* was speed bump: "[O]nly a worker in a transportation industry can be classified as a transportation worker. That point needed no elaboration in *Saxon* because there the plaintiff worked for an airline." *Id.* This—as the dissent from the order denying rehearing of *Bissonnette en banc* persuasively observed—did "the opposite of what *Saxon*'s reasoning and holding require." *Bissonnette*, 59 F.4th at 596 (Nathan, J., dissenting from denial of rehearing *en banc*). Recall *Saxon*—as this dissent reiterates— "emphasizes 'the *performance* of work' and 'the actual work that the members of the class, as a whole, typically carry out.'" *Id.* (quoting *Saxon*, 142 S. Ct. at 1788) (emphasis in original). Other courts have declined to follow the *Bissonnette* majority. *See, e.g., Fraga*, 61 F.4th at 234. The Court joins them, finding that *Saxon*'s guidance is abundantly clear. *See, e.g., id.* at 235.[3]

Accordingly, and for the reasons set forth above, in its analysis of Flowers' motion to compel, the Court applies *Saxon*'s clearly established legal framework, asking: (1) to what class of workers did Mr. Brock belong, and (2) was that class of workers in engaged in foreign or

---

[3] Curiously, in arguing that Mr. Brock does not satisfy § 1's "engaged in foreign or interstate commerce" requirement, Flowers appears to acknowledge that *Saxon* looks to a plaintiff's class of workers and rejects an "industrywide approach" (ECF No. 28 at 13).

interstate commerce? *See Saxon*, 142 S. Ct. at 1788. The Court proceeds to answer these questions below.

### B.  Class of Workers

Flowers argues that Mr. Brock does not satisfy § 1's first requirement because he "cannot be a transportation worker," given that Flowers "is not in the transportation industry" (ECF No. 28 at 9; *see also* ECF No. 33 at 7–9). Flowers further argues that the class of workers to which Mr. Brock belongs "are not transportation workers" (ECF No. 28 at 18). Mr. Brock contends that, looking to the work he performs, the Court should characterize the "class of workers" for its § 1 first-step inquiry as Flowers "Distributors" who "load and unload bakery products" (ECF No. 29 at 20). The Court agrees with Mr. Brock.

As discussed above, the Court first asks to what class of workers Mr. Brock belongs. *See Saxon*, 142 S. Ct. at 1788. In doing so, the Court looks to the work he performs. *See id.*

This question is easily answered. Mr. Brock is an independent distributor who brings Flowers bakery products to market (*see, e.g.,* ECF No. 28-1 at 1 ¶ 4). In doing so, he receives shipments of Flowers products prepared outside of Colorado that he has ordered for his customers, loads them onto his own trucks, and delivers the products to his customers (*see id*; *see also* ECF No. 29-6 at ¶ 4). Accordingly, Mr. Brock belongs to a class of workers who deliver Flowers goods in trucks to their customers, by loading and unloading Flowers' bakery products (*see* ECF No. 29 at 20). *See also Canales*, --- F.4th ----, 2023 WL 3269173, at *6 (1st Cir. May 5, 2023); *Saxon*, 142 S. Ct. at 1788–89 (2022). Mr. Brock's status as an independent distributor who owns his own company, Brock, Inc., does not disturb this conclusion. *See Canales*, --- F.4th ----, 2023 WL 3269173, at *6 ("[The] plaintiffs' additional membership in a class of workers who own companies

8

that distribute products for defendants does not remove them from the class of workers who deliver goods.").[4]

Flowers' argument that Mr. Brock does not belong to a class of "transportation workers"—and that, crucially, Flowers' distributors are factually dissimilar to the airline cargo loaders in *Saxon*—fails to persuade, given that *Saxon*'s definition of "class of workers" was not confined to airline cargo loaders (ECF No. 28 at 19). *See Saxon*, 142 S. Ct. at 1788–89. Instead, *Saxon* teaches that, in defining a "class of workers," courts should look to "the actual work that the members of the class, as a whole, typically carry out." *Id.* For this reason, reading *Saxon* as Flowers urges disserves—and ignores—its thorough textual analyses and ultimate instruction. And to the extent that Flowers argues that Mr. Brock belongs to a class of workers who are not engaged in foreign or interstate commerce, this is a separate analytical exercise that the Court conducts below (*see* ECF No. 28 at 18–19). *See also Saxon*, 142 S. Ct. at 1788.

### C.  Engaged in Foreign or Interstate Commerce

Flowers argues that Mr. Brock cannot satisfy § 1's "engaged in foreign or interstate commerce" requirement because essentially he is a "purely local distributor who does not cross state lines" (ECF No. 28 at 13). Mr. Brock contends that the class of workers to which he belongs is "directly involved" in interstate commerce as contemplated by § 1 (ECF No. 29 at 20). The Court agrees with Mr. Brock.

---

[4] Nor does the nature of Flowers' business alter the Court's characterization of the class of workers to which Mr. Brock belongs, or foreclose his membership into a class of workers that falls under § 1's exemption (*see* ECF No. 29 at 20 n.8). *See also Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 23 (1st Cir. 2020) ("[W]e do not hold that a class of workers must be employed by an interstate transportation business or a business of a certain geographic scope to fall within the Section 1 exemption."); *Rittmann*, 971 F.3d at 919. Flowers' argument to the contrary is unavailing (*see, e.g.*, ECF No. 28 at 9–12; ECF No. 33 at 8).

9

To be sure, § 1's scope is limited. *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001) ("[T]he § 1 exclusion provision [is] afforded a narrow construction."); *see also id.* at 119 ("[T]he text of § 1 precludes interpreting the exclusion provision to defeat the language of § 2 as to all employment contracts. Section 1 exempts from the FAA only contracts of employment of transportation workers."); *McWilliams v. Logicon, Inc.*, 143 F.3d 573, 576 (10th Cir. 1998) ("[A] narrow construction of 9 U.S.C. § 1 to include only employees actually engaged in the channels of foreign or interstate commerce comports with both the text and history of the Federal Arbitration Act.").[5]

In addressing whether a class of workers who "physically load and unload cargo on and off airplanes on a frequent basis" was engaged in interstate commerce under § 1, the Supreme Court concluded that the airplane cargo loaders "plainly do perform activities within the flow of interstate commerce when they handle goods traveling in interstate and foreign commerce, either to load them for air travel or to unload them when they arrive." *Saxon*, 142 S. Ct. at 1789, 1792 (quotations omitted); *see also id.* at 1790 ("[A]ny [transportation] worker must at least play a direct and 'necessary role in the free flow of goods' across borders . . . . transportation workers must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." (citations omitted)). In reaching this conclusion, *Saxon* explicitly rejected an interpretation of § 1 under which "only workers who physically move goods or people across foreign or international boundaries" qualify for its exemption. *Id.* at 1791. Before and after *Saxon*, appellate courts have reached differing conclusions regarding the applicability of § 1's "engaged

---

[5] As the Supreme Court in *Circuit City* noted, textual differences distinguish § 1 from § 2 of the Federal Arbitration Act. *See Circuit City*, 532 U.S. at 114 ("Unlike the 'involving commerce' language in § 2, the words 'any other class of workers engaged in . . . commerce' [in § 1] constitute a residual phrase."); *see also Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020) (explaining textual differences between § 1 and § 2).

in foreign or interstate commerce" requirement. *Compare Fraga*, 61 F.4th at 240, *and Rittmann*, 971 F.3d at 917–18, *with Lopez*, 47 F.4th at 433, *and Wallace*, 970 F.3d at 802.

In arguing that Mr. Brock cannot satisfy § 1's "engaged in foreign or interstate commerce" requirement because he is a local, "intrastate" delivery person—who does not transport Flowers' products across state lines—and is too far removed from the interstate transportation of products, Flowers relies on many of these appellate decisions, and encourages the Court to adopt their reasoning (*see* ECF No. 28 at 14–15; ECF No. 33 at 10). The Court declines to do so. For instance, Flowers cites *Wallace*, emphasizing that § 1 is "about what the worker does, and not where the goods have been" (ECF No. 28 at 15 (quotations omitted)). *See also Wallace*, 970 F.3d at 802. *Wallace* reasoned—relying heavily on *Circuit City*'s "narrow" construction of § 1—that delivery drivers who collected takeout orders from "local restaurants" did not fall under § 1's exemption because they were not "connected . . . to the act of moving [the orders] across state or national borders." *Id.* at 799, 802.

*Wallace* is factually distinguishable. Unlike the *Wallace* drivers who delivered takeout orders from intrastate restaurants to intrastate customers, Mr. Brock orders Flowers products from bakeries across state borders, "sign[s] off" on them at his warehouse, loads them onto his trucks, and delivers them (ECF No. 29-6 at 2 ¶¶ 3–4). *Cf. Wallace*, 970 F.3d at 802. As Mr. Brock argues, he belongs to a class of workers who "haul goods on the final legs of interstate journeys"—in this case, Flowers baked goods from out-of-state bakeries—and is therefore engaged in interstate commerce, "regardless of whether [he] physically cross[es] state lines" (*see* ECF No. 29 at 22–23). *See also Waithaka*, 966 F.3d at 26 (quotations omitted); *Rittmann*, 971 F.3d at 916 ("The packages . . . are simply part of a process by which a delivery provider transfers the packages to a

different vehicle for the last mile of the packages' interstate journeys."). At bottom, this—unlike *Wallace*—is not a case where Mr. Brock's delivery of Flowers' products "occur[s] in an entirely *separate* intrastate transaction." *Fraga*, 61 F.4th at 240 (emphasis added); *see also Immediato v. Postmates, Inc.*, 54 F.4th 67, 77 (1st Cir. 2022) ("[The] work, though, must be a constituent part of that [interstate] movement, as opposed to a part of an *independent* and contingent intrastate transaction." (citation omitted) (emphasis added)). Instead, Mr. Brock is actively engaged in the transportation of Flowers' products across state lines into Colorado, by placing orders for products that arrive from out-of-state bakeries and then delivering those products to his Colorado customers, through Flowers' "Direct-Store-Delivery" sales model (*see* ECF No. 29 at 23). *See also Saxon*, 142 S. Ct. at 1790. This directly affects channels of commerce and constitutes the requisite engagement with interstate commerce that § 1 contemplates. *See id; see also Rittman*, 971 F.3d at 916; *McWilliams*, 143 F.3d at 576.[6]

Flowers also urges the Court to adopt the reasoning of *Lopez v. Cintas Corporation*, 47 F.4th 428 (5th Cir. 2022), where the Fifth Circuit concluded that "[once] the [relevant] goods arrived at the [at-issue] warehouse and were unloaded, anyone interacting with those goods was no longer engaged in interstate commerce." *Id.* at 433. The Court rejects the reasoning of *Lopez*. *Lopez* determined that its relevant class of workers—a class that "pick[ed] up items from a local warehouse and deliver[ed] those items to local customers, with an emphasis on sales and customer service"—lacked a "direct and necessary role" in interstate commerce, emphasizing the class's

---

[6] The Court's conclusion is bolstered by the nature of Brock, Inc.'s contractual relationship with Flowers Baking Company of Denver, LLC—a subsidiary of Flower Bakeries, LLC—under which Brock, Inc. gained the authorization to "sell certain defined [Flowers] products within . . . territories" as an independent contractor, "act[ing] as a franchise distributor of [Flowers Baking Company of Denver, LLC's] products in" that territory (*see, e.g.,* ECF No. 28-1 at 1 ¶¶ 2, 6). *See Fraga*, 61 F.4th at 240–41.

"customer-facing role." *Id.* at 432–33. However, *Lopez*'s abbreviated analysis of its class's engagement with interstate commerce went no further. *See id.* Compared to other courts' thorough analysis of their class's engagement with interstate commerce, *Lopez* fails to persuade—especially, where, as here, Mr. Brock's job duties as an independent distributor included more "sales and customer service" tasks (*see, e.g.* ECF Nos. 28-1 at 36, 29-6 at 2 ¶¶ 3–4). *Compare id.*, *with Fraga,* 61 F.4th at 234; *Rittmann,* 971 F.3d at 917–18. *See also Canales*, --- F.4th ----, 2023 WL 3269173, at *6 ("Workers who frequently perform transportation work do not have their transportation-worker status revoked merely because they also have other responsibilities.").[7]

\* \* \*

Mr. Brock belongs to a class of workers: independent distributors who load and unload Flowers bakery products. For the reasons set forth above, as a member of this class of workers, Mr. Brock is engaged in interstate commerce. Accordingly, Mr. Brock has met his burden of showing that, under *Saxon*, he is a transportation worker exempt from the Federal Arbitration Act under 9 U.S.C. § 1, and therefore the Arbitration Agreement is unenforceable. *See, e.g., Wynn v. United Parcel Serv., Inc.*, No. 21-cv-10029-CRB, 2022 WL 18912481, at *5 (N.D. Cal. Oct. 4, 2022) (concluding that where plaintiff was a "transportation worker exempt from the FAA" under § 1 that "the arbitration agreement [was] unenforceable" (citing *Rittmann*, 971 F.3d at 915)).

### D.  Colorado's Uniform Arbitration Act

---

[7] The same is true for Flower's citation to *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337 (11th Cir. 2021), where central to the Eleventh Circuit's reasoning was its determination that "[t]he transportation worker exemption applies only if the worker belongs to a class of workers in the transportation industry and the class of workers actually engages in foreign or interstate commerce." *Id.* at 1351 (citation omitted). The cramped requirement that a worker must belong to a class of workers in the "transportation industry" is, for the reasons set forth above, inconsistent with § 1, and the Court declines to impose this unnecessary requirement in its § 1 analysis. *See, e.g., Waithaka*, 966 F.3d at 23; *Rittmann*, 971 F.3d at 919; *Bissonnette*, 59 F.4th at 596 (Nathan, J., dissenting from denial of rehearing *en banc*).

Flowers argues that, even if Mr. Brock falls under § 1's transportation workers exemption, he must be compelled to arbitrate under the Colorado Uniform Arbitration Act (ECF No. 28 at 19). The Uniform Arbitration Act does not contain a transportation worker exemption, Flowers' argument goes, and for this reason it applies broadly and reaches Mr. Brock's claims (*see id.*). Mr. Brock contends that the Arbitration Agreement's plain language renders the Uniform Arbitration Act inapplicable in this case (ECF No. 29 at 25). The Court agrees with Mr. Brock.[8]

Courts interpret arbitration agreements using state-law contract principles. *See, e.g., First Options*, 514 U.S. at 944. Under Colorado law, courts look to a contract's language to ascertain the parties' intent, giving contractual terms their "plain and generally accepted" meanings. *See E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005); *Radil v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 233 P.3d 688, 692 (Colo. 2010) ("The existence and scope of an arbitration agreement [is reviewed] applying state law principles governing contract interpretation."). Courts examine the entire contract, avoiding "strained constructions" of its terms. *See Dunning v. Jefferson Cnty. Sch. Dist. R-1*, No. 22-CV-00641-MEH, 2022 WL 3212925, at *3 (D. Colo. Aug. 9, 2022) (citations omitted). "When a contractual provision unambiguously resolves the parties' dispute, the interpreting court's task is over." *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008).

A few cases Flowers identifies provide minimal support for its argument that Mr. Brock's claims are arbitrable under the Uniform Arbitration Act (*see* ECF No. 33 at 11). For instance, in *Davis v. EGL Eagle Glob. Logistics L.P.*, the Fifth Circuit concluded that, where Texas's General

---

[8] The Court agrees with the Eleventh Circuit that, in this case, analyzing the state law arbitration issue after analyzing § 1 is appropriate. *See Hamrick*, 1 F.4th at 1353 ("We would only look to state arbitration law after we decided the federal issue of whether the transportation worker exemption applied to the drivers." (emphasis omitted)).

Arbitration Act and the Federal Arbitration Act applied according to an arbitration agreement, a claim was arbitrable because Texas law rendered the arbitration agreement enforceable, notwithstanding the applicability of an exception under the Federal Arbitration Act. *See Davis v. EGL Eagle Glob. Logistics L.P.*, 243 F. App'x 39, 44 (5th Cir. 2007). But in this case, the Court's analysis begins with the plain text of the parties' Arbitration Agreement. *See, e.g., Level 3*, 535 F.3d at 1154. The Arbitration Agreement states that disputes "shall be submitted to and determined *exclusively* by binding arbitration under the Federal Arbitration Act" (ECF No. 28-1 at 38 (emphasis added)). Elsewhere, the Arbitration Agreement states that it "shall be governed by the FAA and <u>Colorado</u> law *to the extent* <u>Colorado</u> law is *not inconsistent* with the FAA" (*id.* at 40 (italics added)). Notwithstanding the exclusive application of the Federal Arbitration Act to any disputes between the parties—under which Mr. Brock qualifies for § 1's transportation exemption—application of the Uniform Arbitration Act, which does *not* have a similar transportation worker exemption, would be wholly inconsistent with § 1. Simply put, the Arbitration Agreement mandates application of the Federal Arbitration Act and applying Colorado law to require Mr. Brock to arbitrate would be inconsistent with the Act.

Accordingly, interpreting the Arbitration Agreement's relevant and unambiguous provisions, the plain meaning of the phrases "exclusively" and "to the extent <u>Colorado</u> law is not inconsistent with the FAA" mean that Mr. Brock's claims, which are exempt from arbitration under § 1, cannot be arbitrated under the Uniform Arbitration Act (*see* ECF No. 28-1 at 38, 40). *See East Ridge*, 109 P.3d at 974; *Level 3*, 535 F.3d at 1154. To conclude otherwise would result in an impermissibly strained construction of the Arbitration Agreement's terms. *See Dunning*, 2022

WL 3212925, at *3; *see also Dean Witter*, 537 U.S. at 84 ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (quotations omitted)).[9]

* * *

The Court makes one final note. Flowers argues that exempting Mr. Brock "would flout" the Federal Arbitration Act's "history and purpose" (ECF No. 28 at 17). To be sure, § 1 provides a narrow exception relative to § 2's broad enforcement requirement. *See, e.g., Saxon*, 142 S. Ct. at 1792. But the Court cannot "pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal." *Id.* (quotations omitted); *see also id.* at 1792–93 ("[W]e have no warrant to elevate vague invocations of statutory purpose over the words Congress chose."); *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1737 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest.").

Section 1 of the Federal Arbitration Act and *Southwest Airlines Company v. Saxon* establish a clear framework for determining whether § 1's transportation worker exemption applies. Mr. Brock loads and unloads interstate bakery products that he has ordered as an independent distributor for delivery to his customers. Accordingly, and for the reasons set forth above, he belongs to a class of workers engaged in foreign or interstate commerce to which § 1's exemption applies. In sum, Mr. Brock has met his burden of showing that his claims are not

---

[9] As noted above, the parties offer competing interpretations of the Arbitration Agreement and whether Mr. Brock's claims and the parties to this action fall within its scope. *Compare* ECF No. 28 at 6; ECF No. 33 at 3–7, *with* ECF No. 29 at 14, 17. The Court need not address these arguments, because—for the reasons set forth above—Mr. Brock is a "transportation worker" under § 1, and for this reason he is exempt from the Federal Arbitration Act's coverage. *See* § 1; *Wynn*, 2022 WL 18912481, at *5; *New Prime*, 139 S. Ct. at 537–38 ("The parties' private agreement may be crystal clear and require arbitration of every question under the sun, but that does not necessarily mean the Act authorizes a court to stay litigation and send the parties to an arbitral forum.").

arbitrable under § 1's and *Saxon*'s clear framework. *See Shearson/American Express*, 482 U.S. at 227.

## IV. CONCLUSION

Consistent with the above analysis, Flowers' Motion to Dismiss or Stay Proceedings and Compel Individual Arbitration (ECF No. 28) is DENIED.

DATED this 16th day of May 2023.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge